J-S55028-17

2017 PA Super 336

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GREGORY ALAN KURTZ | : | No. 286 MDA 2017 |

Appeal from the Order Entered January 19, 2017
In the Court of Common Pleas of Cumberland County
Criminal Division at No(s):  CP-21-CR-0001790-2016

BEFORE:   DUBOW, RANSOM, and STRASSBURGER,* JJ.

OPINION BY RANSOM, J.:                            **FILED OCTOBER 23, 2017**

The Commonwealth appeals from the order entered January 19, 2017, granting the motion to suppress filed by Appellee, Gregory Alan Kurtz.[1]  We affirm.

The suppression court made the following findings of fact, which are in turn supported by the record.

> On December 2, 2015, at approximately 23:13 hours, Trooper Cummings of the Pennsylvania State Police stopped [Kurtz] on I-81 near mile marker 49.5, Middlesex Township, Cumberland County[,] Pennsylvania.  Trooper Cummings called for back-up because he had someone else in the back of his vehicle in custody

---

* Retired Senior Judge assigned to the Superior Court.

[1] This appeal is properly before us pursuant to the Commonwealth's certification that the order will terminate or substantially handicap the prosecution. **See Commonwealth v. Ivy**, 146 A.3d 241, 244 n.2 (Pa. Super. 2016); **see also** Pa.R.A.P. 311(d).  Thus, our jurisdiction over this appeal is proper.

for DUI. Trooper Caley arrived as back-up, Trooper Cummings apprised Trooper Caley of observations he made of [Kurtz] and Trooper Cummings left the scene.

Trooper Caley approached [Kurtz], who was in his vehicle and immediately detected the odor of an alcoholic beverage emanating from the vehicle. The [T]rooper asked [Kurtz] for his driver's license, registration, insurance and explained to [Kurtz] the reason for the stop. In addition to the smell of an alcohol beverage, the [T]rooper noticed that [Kurtz] had bloodshot [] and glassy eyes, sleepy or sluggish behavior and was having difficulty retrieving the requested documents. Trooper Caley noted that in talking to [Kurtz] that there was a strong odor of alcohol coming from [Kurtz] himself.

Trooper Caley asked [Kurtz] to step out of the vehicle to do field sobriety tests. As [Kurtz] did so, [he] struggled with his footing[,] staggered[,] and stumbled as he walked. [Kurtz's] clothes were disheveled. [Kurtz's] speech was slurred and at times incoherent. Trooper Caley had [Kurtz] do the Standardized Field Sobriety tests. [Kurtz's] performance on all the tests was poor.

Trooper Caley had [Kurtz] take a Portable Breath Test, which clearly showed that [Kurtz] had imbibed alcohol. Trooper Caley was of the opinion that [Kurtz] was under the influence of alcohol and incapable of safely operating his vehicle, and he placed [Kurtz] under arrest.

Trooper Caley took [Kurtz] to the Carlisle Regional Medical Center for legal blood to be drawn. At 23:45 hours, Trooper Caley read the entire DL-26 Implied Consent Form to [Kurtz] before asking for consent to submit a blood sample. The implied consent warning read to [Kurtz] contained a statement which warned [Kurtz] that, "If you refuse to submit to the chemical test…because of your refusal, you will be subject to more severe penalties…[.]" On December 2, 2014, at approximately 23:48 hours [Kurtz's] blood was drawn and the kit was collected for testing.

Findings of Fact in Support of Order Granting Defendant's Pretrial Motion to Suppress Evidence of Blood Results, 1/19/2017, at ¶¶ 1-18 (formatting

modified, citations omitted). Thereafter, Kurtz was charged with driving under the influence (DUI) – general impairment, DUI – high rate of alcohol, DUI – highest rate of alcohol, and failure to regard traffic lane while driving on roadways laned for traffic.[2]

Kurtz filed a motion to suppress the blood results. Within his motion to suppress, Kurtz argued that his blood test was obtained in violation of the Fourth and Fourteenth Amendments of the United States Constitution, and Article 1, Section 8 of the Pennsylvania Constitution because his consent to the test was coerced under threat of enhanced criminal penalties. **See** Kurtz's Motion to Suppress, 9/26/2016, at ¶¶ 6-7 (citing **Birchfield v. North Dakota**, 136 S.Ct. 2160, 2185 (2016)).[3]

Following a hearing in November 2016, the suppression court granted Kurtz's motion and suppressed the results of the blood test, finding that Kurtz "did not knowingly and voluntarily consent to the blood draw." **See** Suppression Order, Findings of Fact, and Conclusions of Law, 1/19/2017, at ¶¶ 1-2.

The Commonwealth timely filed a notice of appeal and court-ordered

---

[2] 75 Pa.C.S. §§ 3802(a)(1), 3802(b), 3802(c), and 3309(1).

[3] At the suppression hearing, the Commonwealth argued for the application of a good faith exception to the exclusionary rule, suggesting that suppression of the evidence would not deter police misconduct where the officer's reliance on the implied consent statute and caselaw authorizing criminal penalties for refusal was objectively reasonable. **See, generally,** Commonwealth's Memorandum of Law (dated 1/17/2017).

Pa.R.A.P. 1925(b) statement. The suppression court issued a responsive opinion.

On appeal, the Commonwealth raises the following issues:

I.      Should the exclusionary rule be applied in Pennsylvania in limited circumstances where suppression is not the proper remedy where police were following valid established precedent pre-***Birchfield***?

II.     Did the [t]rial [c]ourt improperly suppress [] [Kurtz's] blood test results when [he] gave valid actual consent?

Commonwealth's Br. at 4.

Our standard of review is as follows.

When reviewing the grant of a suppression motion, we must determine whether the record supports the trial court's factual findings and "whether the legal conclusions drawn from those facts are correct." ***Commonwealth v. Brown***, 64 A.3d 1101, 1104 (Pa. Super. 2013) (quoting ***Commonwealth v. Cauley***, 10 A.3d 321, 325 (Pa. Super. 2010)). We may only consider evidence presented at the suppression hearing. ***In re L.J.***, 622 Pa. 126, 79 A.3d 1073, 1085–87 (2013). In addition, because the defendant prevailed on this issue before the suppression court, we consider only the defendant's evidence and so much of the Commonwealth's evidence "as remains uncontradicted when read in the context of the record as a whole." ***Brown***, 64 A.3d at 1104 (quoting ***Cauley***, 10 A.3d at 325). We may reverse only if the legal conclusions drawn from the facts are in error. ***Id.***

***Commonwealth v. Haines***, 168 A.3d 231, 2017 PA Super 252, at *3 (filed Aug. 2, 2017).

In ***Birchfield***, the United States Supreme Court recognized that "[t]here must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads." ***Birchfield***, 136 S. Ct. at 2185. Of particular significance, ***Birchfield*** held that "motorists

- 4 -

cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Id.* at 2185-2186. Accordingly, this Court has recognized that Pennsylvania's implied consent scheme was unconstitutional insofar as it threatened to impose enhanced criminal penalties for the refusal to submit to a blood test. *Commonwealth v. Ennels*, 167 A.3d 716, 724 (Pa. Super. 2017), *reargument denied* (Sept. 19, 2017) (noting that "implied consent to a blood test cannot lawfully be based on the threat of such enhanced penalties"); *Commonwealth v. Evans*, 153 A.3d 323, 330-31 (Pa. Super. 2016).

In its first issue, recognizing the post-*Birchfield* state of the law, the Commonwealth contends that we should recognize an exception to the exclusionary rule rooted in *Birchfield*. *See* Commonwealth's Br. at 11.[4] As noted by the Commonwealth, the exclusionary rule is designed to deter police misconduct that violates the Fourth Amendment. *See* Commonwealth's Br. at 12-13 (citing *United States v. Leon*, 486 U.S. 897 (1984)). The Commonwealth argues that the federal good faith exception should apply because *Birchfield* is a federal decision. *See id.* at 21. Federal precedent recognizes application of the good faith exception where officers acted in good faith reliance on existing legislation that is later found to be unconstitutional.

---

[4] The Commonwealth argues for application of the exception where law enforcement reads an arrestee a "DL-26 form" referencing enhanced criminal penalties found to be improperly coercive by *Birchfield*.

- 5 -

*See, e.g., Illinois v. Krull*, 480 U.S. 340, 350 (1987) (holding that exclusion of evidence by penalizing the officer, "who has simply fulfilled his responsibility to enforce the statute as written," would not logically serve the purpose of exclusionary rule to deter Fourth Amendment violations). According to the Commonwealth, law enforcement was required to read the entire DL-26 form to provide notice of the consequence of a refusal based on pre-*Birchfield* legislation and caselaw. *See* Commonwealth's Br. at 19-20 (citing in support *Commonwealth v. Riedel*, 651 A.2d 135 (Pa. 1994)). Thus, according to the Commonwealth, the police should not be penalized for their good faith adherence to the law. Further, the Commonwealth also directs our attention to a Tennessee Supreme Court decision to adopt the good faith exception in limited *Birchfield* contexts. *See* Commonwealth's Br. at 29 (citing *State v. Reynolds*, 504 S.W.3d 283, 288 (Tenn. 2016)).

In response, Kurtz contends that the good faith exception to the exclusionary rule does not apply because it is contrary to Article 1, Section 8, of the Pennsylvania Constitution. *See* Kurtz's Br. at 6. Kurtz relies on *Commonwealth v. Edmunds*, 586 A.2d 887, 901 (Pa. 1991), in which our Supreme Court declined to adopt a good faith exception to the exclusionary rule. In *Edmunds*, our Supreme Court held that "a 'good faith' exception to the exclusionary rule would frustrate the guarantees embodied in Article I, Section 8 of the Pennsylvania Constitution." *Edmunds*, 586 A.2d at 888. In interpreting state constitutional provisions, "each state has the power to

provide broader standards, and go beyond the minimum floor which is established by the federal Constitution." *Edmunds*, 586 A.2d at 894. As interpreted by our Supreme Court, Article I, Section 8 "is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries." *Edmunds*, 586 A.2d at 897.

The Commonwealth attempts to distinguish *Edmunds*, asserting that the *Edmunds* Court did not address a situation in which the officer had probable cause to conduct a search authorized by statute. *See* Commonwealth's Br. at 25, 32-33.[5] We find this argument unpersuasive. As explained in *Edmunds*, "[t]he history of Article I, Section 8, [] indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment[.]" *Edmunds*, 586 A.2d at 897. Contrary to the Commonwealth's assertion, Pennsylvania law has had "clear divergence from federal precedent" in rejecting an exception to the exclusionary rule through Article I, Section 8's "unshakabl[e] link[] to a right of privacy in this Commonwealth." *Id.*

In this case, the trial court reasoned that *Birchfield* established a new constitutional floor ("minimal protections") to which this Commonwealth's

---

[5] The Commonwealth argues that suppression of the evidence would not serve the purpose of deterring Fourth Amendment violations under the circumstances where the officer relied on legislation. *See Krull*, 480 U.S. at 349-50.

- 7 -

historical rejection of the good faith exception should apply. *See* Trial Ct. 1925(a) Op. (TCO), 4/21/2017, at 6-7 (citing *Edmunds, supra*). *Birchfield* recognized that there are "important 'interests in human dignity and privacy'" implicated by blood tests, as they are "searches involving intrusions beyond the body's surface." *Birchfield*, 136 S.Ct. at 2183 (quoting *Schmerber v. California*, 384 U.S. 757*,* 771 (1966)). Because blood tests require piercing of the skin to extract a part of a person's body, they are "significantly more intrusive" than breath tests. *Birchfield*, 136 S.Ct. at 2184; *see also id.* at 2178. Moreover, a blood sample may be preserved by the police and contains "information beyond a simple BAC reading." *Id.* at 2178.

Given the entanglement of privacy interests inherent in a blood test administered by the state, *see Birchfield*, 136 S.Ct. at 2183, we decline to recognize a good faith exception to the exclusionary rule, as it would frustrate the purpose of Article 1, Section 8 of the Pennsylvania Constitution by undermining privacy interests. *See Edmunds, supra*. Accordingly, the court did not err.

In its second issue, the Commonwealth contends that there was sufficient evidence to establish that Kurtz gave "valid actual consent" to the blood test. *See* Commonwealth's Br. at 38-41 (citing in support *Commonwealth v. Cleckley*, 738 A.2d 427 (Pa. 1999)).

> "The Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures." *Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa.

Super. 2012). "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." **Commonwealth v. Strickler**, 757 A.2d 884, 888 (Pa. 2000). "Exceptions to the warrant requirement include the consent exception, the plain view exception, the inventory search exception, the exigent circumstances exception, the automobile exception ..., the stop and frisk exception, and the search incident to arrest exception." **Commonwealth v. Dunnavant**, 63 A.3d 1252, 1257 n.3 (Pa. Super. 2013).

The "administration of a blood test ... performed by an agent of, or at the direction of the government" constitutes a search under both the United States and Pennsylvania Constitutions. **Commonwealth v. Kohl**, 615 A.2d 308, 315 (Pa. 1992); **Schmerber**[, 384 U.S. at 770]. Since the blood test in the case at bar was performed without a warrant, the search is presumptively unreasonable "and therefore constitutionally impermissible, unless an established exception applies." **Strickler**, 757 A.2d at 888.

**Evans**, 153 A.3d at 327–28.

Absent a valid, implied consent, we have required suppression courts to evaluate a defendant's actual consent based on the totality of all the circumstances. **Evans**, 153 A.3d at 331; **Commonwealth v. Danforth**, 576 A.2d 1013, 1022 (Pa. Super. 1990) (*en banc*) ("[w]hether consent has been voluntarily given is a question of fact [to be] determined in each case from the totality of the circumstances."), *aff'd sub nom.*, **Commonwealth v. Kohl**, 615 A.2d 308 (Pa. 1992).

In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such

evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

*Commonwealth v. Haines*, 168 A.3d 231, 2017 PA Super 252, at *4 (filed August 2, 2017) (quoting *Commonwealth v. Smith*, 77 A.3d 562, 573 (Pa. 2013) (internal citations omitted)). Necessarily, this includes consideration of the coercive nature of an officer's advisory of the potential for enhanced criminal penalties. *Evans*, 153 A.3d at 331. Under such circumstances, we have previously affirmed a suppression court's decision to suppress the results of a blood test where consent to the test was obtained after an officer read the DL-26 form. *Ennels*, 167 A.3d at 724.

According to the Commonwealth, the reading of enhanced criminal penalties for refusal from a DL-26 form prior to Kurtz's consent did not necessarily render his consent involuntary. *See* Commonwealth's Br. at 37, 39. To determine whether the consent was voluntary, the Commonwealth suggests that the court may consider a number of factors:

> 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

*Cleckley*, 738 A.2d at 433 (citation omitted). The Commonwealth argues that factors indicating voluntariness of the consent given included Kurtz's

knowledge of his right to refuse, his prior DUI experience, his cooperation with police, and belief that no incriminating evidence would be found. *See* Commonwealth's Br. at 40-42.

In response, Kurtz correctly points out that the knowledge of the right to refuse is not determinative. *See* Kurtz's Br. at 8; *see Cleckley*, 738 A.2d at 432 ("[K]nowledge [of the right to refuse] on the part of the subject of the search may be a factor in ascertaining whether consent was voluntarily given, but [our Supreme Court] decline[d] the invitation to render such a factor determinative of that issue.").[6] Moreover, according to Kurtz, the Commonwealth is required to demonstrate a total absence of coercion for Kurtz's consent to be effective. *Id.* (citing in support *Commonwealth v. Harris*, 239 A.2d 290, 293 (Pa. 1968) ("Consent must at least be freely given to be effective. This means there must be a total absence of duress or coercion, express or implied." (citations omitted)).

Recently, in *Ennels*, we affirmed the suppression of a blood test based on the finding that the defendant was informed that he could face enhanced penalties if he refused the test. *Ennels*, 167 A.3d at 718-719; *see also id.* at 722. In that case, the defendant was read "the DL-26 form that warned

---

[6] In *Cleckley,* our Supreme Court held that an officer does not need to inform an arrestee of the right to refuse a warrantless search for consent to be voluntary under Pa. Const. Art. I, Section 8. *Cleckley*, 738 A.2d at 432 (declining to reverse suppression ruling on sole basis that there was no showing that defendant was aware of right to refuse test).

him that, for at least one of the charges, he faced enhanced criminal penalties if he refused to submit to the blood test." ***Id.*** at 724. This Court held that the trial court did not err in concluding that the threat of criminal penalty on the DL-26 form rendered the defendant's consent involuntary because "***Birchfield*** makes plain that the police may not **threaten** enhanced punishment for refusing a blood test in order to obtain consent[.]" ***Id.*** (citing ***Birchfield***, 136 S.Ct. at 2186).

Here, the suppression court deemed dispositive Kurtz's custodial status and the use of duress or coercive tactics by law enforcement. Specifically, the court found:

> [Kurtz] was under arrest at the time [he consented to the test] and was not free to leave the hospital room where the blood draw was performed. Kurtz was also read the enhanced criminal penalties provision of the DL-26 form, which expressly informed him that a refusal to consent could subject him to enhanced criminal penalties. Here, Kurtz was presented with a dilemma: either consent to the blood draw and risk incriminating himself, or face the possibility of enhanced criminal penalties for refusing to consent. Under ***Birchfield, supra*** and ***Evans, supra***, consent cannot be voluntarily given when a defendant is under the cloud of enhanced criminal penalties for the failure to consent.

TCO at 11. The court concluded that "Kurtz clearly did not provide voluntary consent for the blood draw, as he was under arrest at the time and was clearly informed that if he did not consent he would face the possibility of heightened

- 12 -

criminal penalties." TCO at 12.[7]

Because the suppression court concluded that Kurtz consented to the blood draw after being informed that he faced enhanced criminal penalties for refusal, the court did not err in finding that his consent was involuntary under the circumstances. **See Ennels**, 167 A.3d at 724. Accordingly, we affirm the suppression ruling.

Order affirmed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/23/2017

---

[7] The trial court's findings are supported by the record. **See** Notes of Testimony (N.T.), 11/16/2016, at 16-18. At approximately 11:25 p.m., Kurtz was taken into custody. **See id.** The Trooper transported Kurtz to Carlisle Regional Medical Center, in Cumberland County for a blood draw. **Id.** at 16-17. At approximately 11:45 p.m., Trooper read aloud the standard DL-26 (3-12) implied consent warnings to Kurtz; thereafter, Kurtz gave his consent for a blood sample. **Id.** at 17. The Trooper showed Kurtz the form, "explained and pointed to everything [the Trooper] read, and [the Trooper] placed an 'x' where [Kurtz's] signature would go if he would agree to the test." **Id.** After receiving the results of Kurtz's blood test, the Trooper filed DUI-related charges against Kurtz. **See id.** at 18.